UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| WILLIAM GERARD SANGERVASI, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SAN JOSE, et al., <br><br> Defendants. | Case No. 22-cv-07761-VKD <br><br> **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS; DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> Re: Dkt. Nos. 9, 22 |

On December 8, 2022, plaintiff William Gerard Sangervasi II filed a complaint in this action against defendants the City of San Jose, Edgardo Garcia, and Anthony Mata (collectively "City"). On February 14, 2023, Mr. Sangervasi filed a motion for preliminary injunction. Dkt. No. 9. On March 20, 2023, the City filed a motion to dismiss Mr. Sangervasi's complaint. Dkt. No. 22. The Court heard both motions on April 24, 2023.[1] Having considered the parties' submissions and arguments made at the hearing, the Court grants the City's motion to dismiss and denies Mr. Sangervasi's motion for a preliminary injunction.

I.  **BACKGROUND**

Unless otherwise indicated, the following background facts are drawn from the factual allegations of the complaint, which for present purposes, are deemed true.

Mr. Sangervasi was employed by the San Jose Police Department ("SJPD") as a police officer beginning in 2013. Dkt. No. 1 ¶ 13. In approximately August 2017, defendant Edgardo

---

[1] All parties have consented that this matter be fully heard and decided by a magistrate judge. Dkt. Nos. 4, 16; 28 U.S.C. § 636(c).

Garcia, then the Chief of Police, created a Lesbian, Gay, Bisexual, Transgender, and Queer ("LGBTQ") Advisory Board at the SJPD. *Id.* ¶ 16. According to the City:

> The LGBTQ advisory board is comprised of LGBTQ members of the community and employees within SJPD, as well as representatives from other government agencies who have a mission of serving the LGBTQ community. On a regular basis, the board meets with the police chief and works on a variety of issues including police policies and responses. The board serves as an opportunity for LGBTQ community members and LGBTQ employees of the department to have open ongoing discussions with the police chief about LGBTQ issues. The board's mission includes ensuring equality in policing practices, helping foster an inclusive workplace and as a working group for the departments LGBTQ related projects and initiatives.

*See id.* ¶ 22; San Jose Police Department, *LGTBQ Community Liaison*, https://www.sjpd.org/about-us/organization/office-of-the-chief-of-police/lgbtq-community-liaison (last accessed: May 18, 2023). Concurrent with the creation of the advisory board, Chief Garcia created a LGBTQ Liaison Officer position within the SJPD. *Id.* ¶ 32. According to the City:

> The San Jose Police Department's LGBTQ Liaison Officer serves as a contact point for members of the LGBTQ community within the police department. The Liaison Officer's duties include: Working closely with the LGBTQ community on a variety of community-related events and issues[;] Attending meetings and maintaining relationships with LGBTQ community organizations[;] Coordinating multi-governmental agency responses to the needs of the LGBTQ community[; and] Facilitating SJPD participation in LGBTQ related events throughout the region.

Dkt No. 1 ¶ 36; San Jose Police Department, *LGTBQ Community Liaison*, https://www.sjpd.org/about-us/organization/office-of-the-chief-of-police/lgbtq-community-liaison (last accessed: May 18, 2023).

In August 2019, as part of the region's celebration of Silicon Valley Pride Month, Chief Garcia raised a rainbow-themed LGBTQ pride flag in place of the City of San Jose flag on the flagpole outside SJPD headquarters. *Id.* ¶ 70.

On July 28, 2020, Chief Garcia issued official SJPD Memorandum #2020-33, introducing a rainbow-themed LGBTQ pride shoulder patch for the SJPD uniform. *Id.* ¶ 93. On the same day, Chief Garcia also issued official SJPD Memorandum #2020-36, authorizing SJPD uniformed

personnel to "permanently" wear either a Breast Cancer Awareness, Pride, or Military specialty patch on their uniforms "in lieu of the traditional shoulder patch." *Id.* ¶ 122; *see also* Dkt. No. 9-4 at 18.

On November 11, 2020, Mr. Sangervasi sent a memorandum to Chief Garcia titled, "Desecration of The Uniform by Memorandum #2020-33." Dkt. No. 1 ¶ 133; *see also* Dkt. No. 9-1 ¶ 16; Dkt. No. 9-4. Mr. Sangervasi's memorandum "detailed his intent to forever protect and defend the sacrosanct neutral and impartial visual appearance of The American Uniform" by submitting various "free speech patch and flag designs" that he wanted the SJPD to adopt. Dkt. No. 1 ¶¶ 134, 143. Mr. Sangervasi proposed patch designs featuring phrases and images such as "natural hetero-sexual pride," what appears to be Christian rosary beads encircling the traditional SJPD crest, and an image of the Christian archangel Saint Michael. *See* Dkt. No. 9-4 at 20-21. He proposed flag designs featuring phrases and images including, for example, "father + mother = girls + boys," "white lives matter," and the confederate battle flag. *See id.* at 19. Two days later, on November 13, 2020, Mr. Sangervasi was placed on indefinite administrative leave. Dkt. No. 1 ¶ 156. On December 11, 2020, Mr. Sangervasi received a letter from Acting Chief Dave Knopf[2] denying Mr. Sangervasi's demand that the SJPD adopt Mr. Sangervasi's patch and flag designs. *Id.* ¶ 158.

In March 2021, defendant Anthony Mata was confirmed as the new Chief of Police for the SJPD. *Id.* ¶ 166. Chief Mata has raised the LGBTQ pride flag at SJPD headquarters and personally worn the LGBTQ pride patch on his own uniform. *Id.* ¶ 168.

On June 7, 2021, the SJPD sent Mr. Sangervasi notice of an internal affairs complaint against him, initiated by the office of the Chief of Police. *Id.* ¶ 169. On August 19, 2021, Mr. Sangervasi met with internal affairs as part of its investigation. *Id.* ¶ 174. On November 10, 2021, the SJPD served Mr. Sangervasi a Notice of Intended Discipline ("NOID") officially stating SJPD's intent to terminate Mr. Sangervasi's employment. *Id.* ¶ 182. On January 28, 2022, Mr. Sangervasi responded to the NOID in writing. *Id.* ¶ 191. The SJPD served Mr. Sangervasi a

---

[2] Chief Garcia retired from the SJPD in December 2020. Dkt. No. 1 ¶ 163.

1   Notice of Discipline on February 11, 2022, terminating him from his position effective February

2   12, 2022. *Id.* ¶ 196. Mr. Sangervasi appealed his termination to San Jose's Civil Service

3   Commission. *Id.* ¶¶ 199-203. The Civil Service Commission issued its order upholding the

4   termination on May 12, 2022. *Id.* ¶ 206. On August 10, 2022, pursuant to California Code of

5   Civil Procedure § 1094.5, Mr. Sangervasi filed a petition for a writ of administrative mandate in

6   California state court requesting judicial review of the Civil Service Commission's decision. *Id.*

7   ¶ 207. As of the date of this order, Mr. Sangervasi's state court petition remains pending.[3]

8       In his complaint in this action, Mr. Sangervasi asserts three claims for relief under 42

9   U.S.C. § 1983. He alleges that the City violated the free speech and free exercise of religion

10  clauses of the First Amendment and the equal protection clause of the Fourteenth Amendment. *Id.*

11  ¶¶ 209-277. In addition, he asserts three claims for violations of similar provisions of the

12  California Constitution. *Id.* ¶¶ 278-295. Mr. Sangervasi seeks declaratory and injunctive relief,

13  nominal and punitive damages, and costs. *Id.* at 59-65.

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id.*

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "the court is not required to accept legal conclusions cast in the form of factual allegations if those

---

[3] *See* Case No. 22CV401855, Superior Court for the County of Santa Clara, California. Mr. Sangervasi clarified during the hearing on this matter that none of his claims in this federal court action challenge his termination.

4

conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). Although pro se pleadings are liberally construed and held to a less stringent standard than those drafted by lawyers, *see Haines v. Kerner*, 404 U.S. 519, 520–21 (1972), a complaint (or portion thereof) should be dismissed for failure to state a claim if it fails to set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007); *see also* Fed. R. Civ. P. 12(b)(6).

Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. A claim is plausible if its factual content permits the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id*. A plaintiff does not have to provide detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678.

Documents appended to or incorporated into the complaint or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018); *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

### B. Motion for Preliminary Injunction

Preliminary injunctive relief is an "extraordinary remedy" that is "never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Rather, the moving party bears the burden of demonstrating that "he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id*. at 20. In each case, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). Mandatory injunctions, which require affirmative action rather than maintaining the status quo, are "particularly disfavored." *Garcia v. Google, Inc.*, 786 F.3d

733, 740 (9th Cir. 2015) (quoting *Stanley v. Univ. of S. California*, 13 F.3d 1313, 1320 (9th Cir. 1994)). To succeed, the plaintiff "must establish that the law and facts *clearly favor*" his or her position, not simply that the plaintiff "is likely to succeed." *Id.* (emphasis in original).

### III. DISCUSSION

#### A. The City's Motion to Dismiss

Mr. Sangervasi does not assert any claims predicated upon the SJPD's termination of his employment. Dkt. No. 28. Instead, Mr. Sangervasi's federal claims are based solely on alleged violations of his constitutional rights under the First and Fourteenth Amendments. The Court considers each of those claims separately. Because the Court concludes that it must dismiss all of Mr. Sangervasi's federal claims, the Court also dismisses his state law claims. *See Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 664 (9th Cir. 2002) ("[W]ith the dismissal of [plaintiff's] federal constitutional claim . . . we have no authority to retain jurisdiction over [his] state law claims.").

#### 1. Claim 1: First Amendment Free Speech

Mr. Sangervasi asserts that defendants violated his First Amendment right to freedom of speech. Dkt. No. 1 ¶¶ 209-30. At the hearing, Mr. Sangervasi explained that his claim has two parts. First, he says that the SJPD's refusal to approve his patch and flag designs as official SJPD designs reflect impermissible viewpoint-based censorship. Dkt. No. 1 ¶¶ 133, 158; Dkt. No. 9-4 at 12; Dkt. No. 28. Second, he says that the SJPD's refusal to permit him to wear or use these designs on his own uniform or on a flag, even if not approved by the SJPD, also violates his free speech rights. *Id.* ¶ 141; *see* Dkt. No. 25 at 7; Dkt. No. 28. The premise underlying both parts of Mr. Sangervasi's claim is that the SJPD uniform and the SJPD flagpole are public forums. He contends that the SJPD invited individual speech in both places. *Id.* ¶ 123, 126. The City argues that Mr. Sangervasi cannot state a claim for violation of the free speech clause of the First Amendment because neither the uniform nor the flagpole is a public forum in which he, as a member of the public, has a right to engage in individual speech. Dkt. No. 22 at 7. Rather, the City contends that the SJPD uniform and the flagpole are forums for government speech only. It contends that the authorized patch and flag designs reflect government speech, which is not

constrained by the First Amendment.[4] *Id.*

The City argues that Mr. Sangervasi's complaint fails to state a cognizable legal theory under the First Amendment because the SJPD uniform and flagpole are not forums for public speech. Dkt. No. 22 at 7. "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009). "The First Amendment's Free Speech Clause does not prevent the government from declining to express a view." *Shurtleff v. City of Boston, Massachusetts*, ––– U.S. –––, 142 S. Ct. 1583, 1589 (2022) (citing *Pleasant Grove City*, 555 U.S. at 467-69). "When the government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Id.* (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207-08 (2015). "The Constitution therefore relies first and foremost on the ballot box, not on rules against viewpoint discrimination, to check the government when it speaks." *Id.* (citing *Board of Regents of Univ. of Wis. System v. Southworth*, 529 U.S. 217, 235 (2000)). The government may enlist private persons to convey its governmental message, by deputizing private persons as its agents. "In that kind of situation, private persons assume a public or quasi-public capacity that empowers them to speak on behalf of the government. So long as this responsibility is *voluntarily assumed*, speech by a private party within the scope of his power to speak for the government constitutes government speech." *Shurtleff*, 142 S. Ct. at 1600 (Alito, J. concurring) (emphasis added).

The SJPD Police Chief has authorized police officers to wear one of three specialty patches to demonstrate support for cancer awareness, the military, and the LGBTQ community. Dkt. No. 1 at ¶¶ 145-146. The parties seem to agree that these special voluntary patches reflect the government's policy viewpoint. *See* Dkt. No. 1 ¶¶ 122-23; Dkt. No. 22 at 7. The SJPD Police Chief authorized the specialty patches via official departmental memoranda. Dkt. No. 9-4 at 18.

---

[4] The City also argues that Mr. Sangervasi's claims must be dismissed because Mr. Sangervasi is a public employee and because his speech includes true threats. Because Mr. Sangervasi frames his claim based on his rights as an individual member of the public, and because the Court concludes that his claim is foreclosed by the government speech doctrine, the Court does not reach the City's "public employee" or "true threat" arguments.

Memorandum #2020-36 states that "[i]n an effort to allow officers to show support for *specifically authorized* causes, three specialty patches are now authorized to be permanently worn by uniformed personnel," including the Pride patch. *Id.* (emphasis added). Likewise, Memorandum #2020-33, introducing the Pride patch, states: "The SJPD Pride Rainbow Patch is a public awareness campaign to demonstrate the support and inclusiveness of the SJPD with [the] LGBTQ community and all LGBTQ police personnel." *Id.* at 16. The memoranda make clear that wearing any of the specialty patches, including the Pride patch, is voluntary. Mr. Sangervasi does not allege otherwise. *Id.* at 18 ("All San Jose Police uniformed personnel *wishing* to participate, *may wear any* of the three authorized specialty SJPD patches on their duty uniforms in lieu of the traditional shoulder patch.").

Mr. Sangervasi says that because the Pride patch is "intended to stimulate conversation with the community," and to "allow department members to show individual support for issues important to them," *see* Dkt. No. 9-4 at 16, the SJPD has turned the police uniform into a public forum. *See* Dkt. No. 25 at 7-9. Mr. Sangervasi is mistaken. While government conduct *may* create a forum for speech, the complaint alleges no facts plausibly supporting the contention that the SJPD has done so here.

As the Supreme Court explained in *Shurtleff*, determining the boundary between government speech and private expression requires "a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." 142 S. Ct. at 1589. This inquiry includes consideration of "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589-1590. Here, Mr. Sangervasi does not suggest that, as an historical matter, a police officer's uniform and a police department flagpole are traditional public forums for private expression. He also does not suggest that the public is likely to perceive either as affording the public an opportunity for private expression. To the contrary, Mr. Sangervasi emphasizes that a police officer's uniform is an *official* uniform, and the flagpole outside the SJPD headquarters is also a place for *official* symbols of the City. Dkt. No. 1 at 2-4; Dkt. No. 25 at 8. Mr. Sangervasi's principal argument is

1  that the SJPD's own conduct in authorizing the patch and flag designs created public forums for
2  individual speech.  However, it is clear from the allegations in the complaint that the SJPD
3  completely controlled the uniform patch designs and the flag designs in question.  This indicates
4  that the government actively controlled and shaped the speech permitted on both the police
5  uniform and the flagpole.

6  These circumstances contrast sharply with the facts in *Shurtleff*, where the Supreme Court
7  held that the city of Boston engaged in impermissible viewpoint discrimination when it refused to
8  allow a private group to display a religion-themed flag in front of Boston City Hall.  142 S. Ct. at
9  1593.  For many years, Boston allowed various organizations to hold flag-raising ceremonies on
10 the plaza near City Hall.  *Id.* at 1588.  "Boston told the public that it sought 'to accommodate all
11 applicants' who wished to hold events at Boston's 'public forums,' including on City Hall Plaza."
12 *Id.* at 1592.  "The city's practice was to approve flag raisings, without exception."  *Id.*  And "the
13 city had nothing—no written policies or clear internal guidance—about what flags groups could
14 fly and what those flags would communicate."  *Id.*  Calling it "the most salient feature" of the
15 case, the Supreme Court concluded that Boston exercised no control whatsoever over the
16 messages conveyed by the flag-raisings.  *Id.*

17 As described in the complaint, the SJPD uniform and flagpole are not public forums, and
18 the adoption of official department designs is clearly government speech.  This speech is not
19 subject to the constraints of the First Amendment.  For these reasons, Mr. Sangervasi has not
20 stated any cognizable legal theory for violation of his First Amendment free speech rights.

**2.   Claim 2:  First Amendment Free Exercise of Religion**

Mr. Sangervasi also alleges that the SJPD's conduct constitutes a violation of his rights under the free exercise clause of the First Amendment.  Dkt. No. 1 ¶¶ 231-248.  Mr. Sangervasi elaborated on this claim during the hearing.  Dkt. No. 28.  Specifically, he explained that the SJPD's rejection of his patch designs (many of which include religious symbols) prevented him from signaling to the general public his religious affiliation, which undermines his ability to evangelize, as his religious beliefs require.  *Id.*  This claim fails for the same reasons Mr. Sangervasi's free speech claim fails.

9

The free speech and free exercise clauses of the First Amendment "work in tandem." *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1159 (9th Cir. 2022). "Where the Free Exercise Clause protects religious exercises . . . the Free Speech Clause provides overlapping protection for expressive religious activities." *Id.* (quoting *Kennedy v. Bremerton Sch. Dist.*, ––– U.S. –––, 142 S. Ct. 2407, 2421 (2022)). "Thus, the First Amendment doubly protects religious speech." *Id.* (internal quotation marks omitted). Under the guarantee of the free exercise clause, a plaintiff must "show[] that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 142 S. Ct. at 2422 (citation omitted). Where free expression is protected, the government may not discriminate in the regulation of expression based on its content or viewpoint. *Sloman v. Tadlock*, 21 F.3d 1462, 1469-70 (9th Cir. 1994). "But when the government speaks for itself, the First Amendment does not demand airtime for all views." *Shurtleff*, 142 S. Ct. at 1587.

Mr. Sangervasi does not allege any burden on his sincere religious practice pursuant to a policy that is not neutral or generally applicable. Rather, he complains that, if the SJPD authorizes specialty uniform patches to be worn on a voluntary basis, it must allow him to wear religion-themed patches of his own design. *See* Dkt. No. 1 ¶¶ 238-39, 243, 245. These allegations fail to state a claim for relief because the City has not created a public forum in which Mr. Sangervasi has a right to express *any* views, let alone those views that may be grounded in religious practice or belief. In the absence of such a forum and as discussed above, the SJPD's patch designs amount to government speech and do not burden Mr. Sangervasi's religious practice.

### 3.     Claim 3:  Fourteenth Amendment Equal Protection

Mr. Sangervasi asserts a claim for violation of the equal protection clause of the Fourteenth Amendment based on allegations that the City "segregated, excluded, and discriminated against [him] admittedly and explicitly because of [his] classes and characteristics of race, color, religious creed, sex and 'sexual orientation', at a minimum." Dkt. No. 1 ¶ 253. Many of Mr. Sangervasi's allegations in support of this claim merely repeat those made in support of his First Amendment claim. *See, e.g.*, Dkt. No. 1 ¶¶ 254-57. However, the focus of Mr. Sangervasi's Fourteenth Amendment claim appears to be the SJPD's creation of an LGBTQ Advisory Board and LGBTQ

Liaison Officer position. In particular, he alleges the "*existence* of a[n] . . . 'LGBTQ Advisory Board' at an American police department . . . has inflicted a visibly perceptible predisposition of class-based sexual bias, preference, favoritism, prejudice, and segregationist intent, against [him]." *Id.* ¶ 260 (emphasis added). As he explained at the hearing, Mr. Sangervasi contends that these actions are discriminatory because they confer a benefit on a distinct group of individuals. Dkt. No. 28. While Mr. Sangervasi alleges that the LGBTQ Liaison Officer position was "off-limits" to him because of his sexual orientation, Dkt. No. 1 ¶ 262, he clarified that he has never applied for nor sought appointment to either the LGTBQ Liaison Officer position or the LGBTQ Advisory Board. Dkt. No. 28. The City argues that Mr. Sangervasi fails to state a claim for violation of the equal protection clause because he has not and cannot allege that defendants caused him any harm. Dkt. No. 22 at 9.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). A plaintiff alleging denial of equal protection under 42 U.S.C. § 1983 must plead intentional unlawful discrimination or allege facts that are at least susceptible of an inference of discriminatory intent. *See Monteiro v. Tempe Union High School Dist.*, 158 F.3d 1022, 1026 (9th Cir. 1998). In addition, a plaintiff must have suffered an "injury in fact"—i.e., the invasion of a legally protected interest which is both "concrete and particularized" and "actual or imminent," not "conjectural" or "hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). And "there must be a causal connection between the injury and the conduct complained of." *Id.* at 560.

Mr. Sangervasi does not allege any facts that could plausibly support an inference that the SJPD intentionally treated him differently from others who are similarly situated. He alleges only that the LGBTQ advisory board and liaison officer position create a "perceptible predisposition of . . . bias." Dkt. 1 ¶ 260. The City has chosen to address the public safety needs of the LGBTQ community by engaging in outreach to and collaboration with members of that community. Mr. Sangervasi dislikes the policy choice the City has made, but this does not mean he has been

injured by that policy choice. Rather, Mr. Sangervasi's only alleged injury is "the psychological consequence presumably produced by observation of conduct with which [he] disagrees." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982) (abrogated in part on other grounds by *Bowen v. Kendrick*, 487 U.S. 589 1988). "That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms." *Valley Forge*, 454 U.S. at 485–86. As the City argues, a government can, without violating the Constitution, selectively support a program to encourage certain activities it believes to be in the public interest, without at the same time supporting an alternative program. *Shurtleff*, 142 S. Ct. at 1587.

Because Mr. Sangervasi alleges no injury that he has suffered as a consequence of the creation of the advisory board and liaison officer position, nor any discriminatory treatment whatsoever, he fails to state a claim for violation of the equal protection clause of the Fourteenth Amendment.

### B. Whether Leave to Amend Should Be Granted

While leave to amend is generally granted liberally, the Court has discretion to dismiss a claim without leave to amend if amendment would be futile. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *Rivera v. BAC Home Loans Servicing, L.P.*, 756 F. Supp. 2d 1193, 1197 (N.D. Cal. 2010) (citing *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996)). "[A] district court should not dismiss a pro se complaint without leave to amend unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (quotations omitted).

Because Mr. Sangervasi's First Amendment claim is predicated on conduct that is government speech in forums that are not public forums, the Court concludes that Mr. Sangervasi could not amend his complaint to allege any facts sufficient to state a claim for violation of the First Amendment, and thus, amendment would be futile.

Likewise, as discussed above, Mr. Sangervasi's equal protection claim is based on his objection to the SJPD's creation of an LGBTQ advisory board and liaison officer position. He has suffered no injury as a consequence of the SJPD's outreach to the LGBTQ community, and

therefore cannot state a claim for violation of the equal protection clause of the Fourteenth Amendment. Thus, the Court also finds that amendment of Mr. Sangervasi's Fourteenth Amendment claim would be futile.

### C. Mr. Sangervasi's Motion for a Preliminary Injunction

As noted above, in order to obtain a preliminary injunction, Mr. Sangervasi must establish not merely that he is likely to succeed on the merits of his claim, but that the law and facts clearly favor his position. Having concluded that Mr. Sangervasi fails to state any claim for violation of the First Amendment or the Fourteenth Amendment and that leave to amend would be futile, the Court must also conclude he has failed to meet this standard.

Mr. Sangervasi's motion for a preliminary injunction is denied.

## IV. CONCLUSION

The Court grants the City's motion to dismiss the complaint, without leave to amend. Mr. Sangervasi's motion for a preliminary injunction is denied.

**IT IS SO ORDERED.**

Dated: May 22, 2023

*Virginia K. DeMarchi*
VIRGINIA K. DEMARCHI
United States Magistrate Judge